J-A06034-23

2023 PA SUPER 58

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHARLES MICHAEL BECHER | : | No. 155 WDA 2022 |

Appeal from the Order Entered January 26, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0001032-2021

BEFORE: OLSON, J., NICHOLS, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                          **FILED: April 4, 2023**

The Commonwealth appeals from the order of the Court of Common Pleas of Allegheny County (trial court) granting a new trial to Charles Michael Becher (Becher) after a jury convicted him of third-degree murder.

By way of background, Becher shot and killed the victim but claimed self-defense at trial. Several witnesses testified that before the shooting, Becher's cousins threatened the group that the victim was in, yelling that they planned to get Becher and that he was going to "smoke" them. Becher objected to the testimony on hearsay grounds, but the trial court overruled him. The trial court gave a precautionary instruction to the jury that it could not use the threats of his cousins as proof of Becher's intent. After the verdict, Becher moved for a new trial but limited his claim to the weight of the

_____

[*] Retired Senior Judge assigned to the Superior Court.

evidence. At sentencing, however, the trial court announced that it was granting Becher a new trial because the testimony about the threats was "blatant, inadmissible hearsay" going to Becher's intent. The court explained that it had authority to grant a new trial "in the interest of justice" under ***Commonwealth v. Powell***, 590 A.2d 1240, 1243 (Pa. 1991) ("[I]f a trial court determines that the process has been unfair or prejudicial … it may, in the exercise of its discretionary powers, grant a new trial 'in the interest of justice.'").

Recently, though, in ***Temple v. Providence Care Ctr., LLC***, 233 A.3d 750 (Pa. filed July 21, 2020), our Supreme Court limited a trial court's authority to grant a new trial *sua sponte* when a party recognizes an error but fails to preserve it. In those cases, our Supreme Court held that a trial court may exercise its *sua sponte* authority only in "truly exceptional circumstances" involving "exceedingly clear error" that results in a "manifest injustice." ***Id.*** at 766.

Applying that standard here, we find that the trial court abused its discretion in granting Becher a new trial "in the interest of justice" because it is not "exceedingly clear" that the testimony about the threats was "blatant, inadmissible hearsay" that prejudiced Becher. Accordingly, we reverse and remand with instructions.

**I.**

**A.**

On January 29, 2021, Becher, along with his cousin (who he considers to be his "sister") Khaiya Richards (Khaiya), his cousins Amanda Becher and Cailyn Richards (Cailyn), and another friend Khalil Walls (Walls), went to Club Erotica, an adult "strip club" in McKees Rocks, Pennsylvania. There was also a group of motorcycle club members that included Seth McDermit, along with William Especto, Robert Johnson, David Li, Ryan Kass and Christopher Butler.[1]

Some members of the motorcycle club went outside to smoke when a confrontation occurred between some of the club members and an intoxicated patron who was leaving the club and stumbled into them. After words were exchanged, a fight ensued and the intoxicated patron was beaten by the club members until he was bleeding. After that individual fled the scene, Khaiya, who was outside smoking with Amanda Becher, began to taunt the men who had beaten the intoxicated patron.

Christopher Butler took offense at the woman's comments and the two of them then got into a physical struggle, exchanging blows. Eventually the club members were able to separate Mr. Butler and Khaiya. During this confrontation, Khaiya told them that she was going to get her cousin and that

---

[1] Mr. Butler was also shot and killed that evening, but Becher was not charged in his shooting. Rather, Walls was charged in his death.

he was going to "smoke every single one of you." Becher was inside the club during this time. He was not informed about the fight but when Amanda Becher ran into the club and screamed "Khaiya," he went outside to see what was happening.

Having finally separated Khaiya and Mr. Butler, Mr. Li convinced his fellow club members that they should leave. As they were dragging Mr. Butler to the parking lot, however, Cailyn and Khaiya confronted the men, and Cailyn began to fight with Mr. Butler. Cailyn then confronted Mr. Johnson and started slapping him in the face.

At that point, Becher pulled out his gun and struck Mr. Johnson with it. In doing so, he dropped the weapon and a "scrum" then occurred where people were fighting in a group with some on the ground and some standing. It was during this part of the melee that Becher recovered his weapon, was shot (alleged by Becher to be Mr. Walls), and then shot Mr. McDermit; Mr. Johnson was shot twice (nonlethal wounds); and Mr. Butler was also shot and killed. Becher stayed at the scene, with his firearm in his possession, and told responding police officers that he acted in self-defense.

Becher was charged with criminal homicide in relation to the death of one of the victims, Mr. McDermit. Walls was charged with criminal homicide in relation to the death of Mr. Butler. Becher's case was severed from Walls' case. Becher's counsel also indicated that he (Becher's counsel) would contend that Walls shot Becher during the confrontation while Becher was

- 4 -

fighting with members of the motorcycle club, and that Becher, having been shot, was a substantial factor in Becher's decision to use his own weapon.

**B.**

At trial, three members of the motorcycle club, David Li, William Especto and Robert Johnson, testified that during the altercation, Khaiya kept screaming that she was going to get her "cousin"—Becher—to come and "smoke" them. After it had been mentioned several times, Becher's counsel objected on hearsay grounds to the admission of the cousins' threats. The trial court overruled the objection. After closing arguments where the Commonwealth referred to Khaiya's testimony, the trial court provided the jury with an unrequested precautionary instruction cautioning that those statements could not be used against Becher to prove his intent. That instruction provided:

> Now you also heard evidence that Ms. Richards made statements to the effect that my cousin will smoke you, my cousin will shoot you. There's conflict as to whether those statements were made. If you find that she did make such a statement, you cannot regard the statement standing alone as proof of any intent or state of mind of the defendant. You may regard that evidence if you find that it happened in evaluating and find out other facts that might bear on the events of this case, but the statement made outside the presence of the defendant cannot be proof of the defendant's intent or state of mind unless you determine from the evidence that the defendant was conscious of and promoted the statement, or endorses that statement in some fashion.

T.T. at 1282-83.

**C.**

After the jury found him guilty of third-degree murder, Becher filed a motion for new trial claiming that the verdict was against the weight of the evidence.[2] As the sentencing hearing opened, the trial court stated it would grant Becher a new trial on "an alternate basis," that is, because of the testimony that during the altercation Khaiya threatened that her "cousin" was going to "smoke" them. This testimony, the court found, was "blatant, inadmissible hearsay" that was so prejudicial that even if it was not hearsay, a new trial was warranted "in the interest of justice." The trial court explained:

> It was not fair to have this evidence come in that Mr. Becher was going to smoke all of them. He was going to shoot all of them. He wasn't there. There's no evidence that he endorsed that statement. There was no evidence that he even knew the statement was made. By the time Mr. Becher is on the scene and actions occur, the evidence is already in that his intent is to smoke them, at least from his cousin, who continues to promote the hostility. Promote the fight. She was the most -- in my view, the most active person in this whole mess that caused this to continue. I gave a limiting instruction at the end of the case. That instruction was not sought by either lawyer. I did it because I was disturbed by the evidence when I heard it. When I heard it again from another witness. And the prejudicial -- arguably it's relevant. Arguably because it occurred during the events of this case. But it is highly prejudicial. It's blatant hearsay. I cannot even come close to justifying the inception. And yet, it goes directly to the Defendant's state of mind. What intent he had when he used the gun when he used it. When he used it.

_____

[2] A defendant can raise a weight challenge "with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A).

Now, [the Commonwealth] argued this in his closing, and rightfully so, that [Becher] introduced the gun into this. He pulled the gun, albeit the other side said he pulled it to use it as a club, not as a gun. But the fact is he introduced it. What was his intent when he introduced the gun? Is it colored by the fact that his cousin already told all these people he's going to smoke you with this? I would say it is. I would say you can't unring that bell. And my instructions to the Jury at the end of the closing arguments was way too little and way too late.

N.T., 1/19/22, at 8-9 (some paragraph breaks omitted).

After the Commonwealth filed this appeal,[3] the trial court expanded on its reasoning in its Pa.R.A.P. 1925(a) opinion, emphasizing that the Commonwealth elicited the statements several times during its case-in-chief and mentioned them four times in its closing argument.

The principal issues in the trial were (a) Becher's state of mind and/or intent and (b) whether Becher was acting in self-

_____

[3] Under Pennsylvania Rule of Appellate Procedure 311(a)(6), the Commonwealth may appeal from "an order in a criminal proceeding awarding a new trial … where the Commonwealth claims that the trial court committed an error of law." Pa.R.A.P. 311(a)(6). Becher argues that we lack jurisdiction of this appeal under Rule 311(a)(6) because our standard of review of an order granting a new trial "in the interest of justice" is an abuse of discretion. *See* ***Powell***, 590 A.2d at 1243. As we have explained, though, "it is well settled that an abuse of discretion includes committing an error of law." ***Commonwealth v. Andre***, 17 A.3d 951, 957 n.7 (Pa. Super. 2011). Here, among other things, the Commonwealth alleges that the trial court erred in concluding the testimony about the threats constituted hearsay. In similar circumstances, we have found that we have jurisdiction under Rule 311(a)(6). *See* ***Commonwealth v. Bell***, 167 A.3d 744, 746 n.1 (Pa. Super. 2017) (Commonwealth permitted to take appeal from trial court order granting new trial based on claim that court erroneously admitted evidence of defendant's refusal to submit to a blood test at his DUI trial); *see also* ***Commonwealth v. Dorm***, 971 A.2d 1284, 1285 n.1 (Pa. Super. 2009) (finding this Court had jurisdiction of Commonwealth appeal from order granting new trial "in the interest of justice.").

defense when he used a firearm which caused the death of Mr. McDermit. In this Court's view, the inadmissible hearsay statements attributed to Ms. Richards were prejudicial to the point of depriving Becher of a fair trial because these statements went directly to the issues of malice and to whether the Commonwealth disproved self-defense beyond a reasonable doubt. The significance placed on this evidence by the Commonwealth at trial cannot be overstated. The Commonwealth elicited these statements at least seven times during its case-in-chief through three different eyewitnesses. The Commonwealth referenced the statements at least four times during its closing argument in order to convince the jury that it fulfilled its burden of proof. As set forth above, in his closing argument to the jury, the Commonwealth's attorney argued: "We have shown you that Khaiya [sic] Richards threatened to get her cousin to go and smoke these men;" later, in his closing argument, the prosecutor argued that the victim group was trying to walk away, "they weren't following anybody until Khaiya [sic] Richards started telling them that she was going to get their cousin to 'smoke' them. That's the real essence of it" [emphasis supplied]. In this Court's view, it improperly permitted the jury to repeatedly hear and consider blatantly inadmissible hearsay that was irreparably prejudicial to [Becher].

Trial Court Opinion (TCO), 6/30/22, at 12 (footnoted omitted).

The trial court reiterated that its determination was unaffected by its limiting instruction to the jury because it was insufficient to cure the prejudicial effect of those statements.

This Court's unsolicited limiting instruction cannot be regarded as sufficient and curative. As an initial matter, the Court's instruction was simply not accurate. Contrary to the language of the instruction, the evidence was blatant hearsay and should not have been offered to the jury for the purpose intended. Furthermore, the prejudicial impact of this inadmissible evidence was enormous given that the evidence was presented numerous times through three separate Commonwealth witnesses and given that the Commonwealth implored the jury that this evidence was the "essence" of this case in its closing argument to the jury. While this Court attempted to ameliorate the impact of this

evidence prior to verdict, it is clear that the Court's attempt did not, and could not have had, the appropriate curative effect.

*Id.* at 13.

The same held true for Becher's failure to object to the inadmissible hearsay until after the jury had heard it several times.

> The fact that defense counsel did not object to the admission of the threats evidence until well after it had been admitted is of no moment. The substance of the statements went directly to the ultimate issues in this case and the Commonwealth extolled the statements as "the essence" of this case. The curative instruction read by this Court was legally insufficient. Under the unusual circumstances in this case, this Court cannot permit the verdict in this case to stand. The interest of justice requires that Becher be given a new trial such that a new jury can deliberate and reach a verdict after considering only legally admissible evidence. The motion for a new trial was properly granted.

*Id.* at 13.

The Commonwealth then filed this appeal contending that the trial court abused its discretion when it *sua sponte* granted Becher a new trial "in the interest of justice" because none of the reasons given by the trial court justified it taking such an extreme measure.

## II.

Neither party in this case denies that the trial court had the authority under **Powell** to grant a new trial "in the interest of justice." We recently summarized **Powell** as follows:

> In **Powell**, the defendant was represented by the public defender's office. [**Powell**, 590 A.2d] at 1241. On the day of trial, his counsel became ill and was replaced with substitute counsel. *Id.* Substitute counsel requested a continuance to review the case properly, but the trial court denied the request.

*Id.* After the defendant waived a jury trial and proceeded with substitute counsel, the trial court found him guilty of the charged offenses. *Id.* at 1241-42. The defendant obtained new counsel, and filed a motion for a new trial *nunc pro tunc* alleging the ineffectiveness of trial counsel. *Id.* at 1241. The trial court then granted the defendant a new trial "in the interest of justice." *Id.* The Pennsylvania Supreme Court affirmed, concluding: "A trial court has an immemorial right to grant a new trial, whenever, in its opinion, the justice of the particular case so requires." *Id.* at 1242 (citations and quotation marks omitted) ("[T]his Court has expressly approved of a trial court's granting a new trial, *sua sponte*, for the promotion of justice, if sufficient cause exists."). The Court opined:

> It is the trial judge's review of the conditions and activity surrounding the trial which leaves him or her in the best position to make determinations regarding the fairness of the process and its outcome. **It is apparent, therefore, if a trial court determines that the process has been unfair or prejudicial, even where the prejudice arises from actions of the court, it may, in the exercise of its discretionary powers, grant a new trial "in the interest of justice."**
>
> * * *
>
> **This concept of "in the interest of justice" is merely a recognition of the trial court's discretionary power to ensure the fairness of the proceedings during the adjudicatory stage.** ...

*Id.* at 1243 (emphases added and citations omitted).

*Commonwealth v. Lang*, 275 A.3d 1072 (Pa. Super. filed May 16, 2022).

Not addressed in our summary in *Lang*, though, was *Temple v. Providence Care Ctr., LLC*, 233 A.3d 750 (Pa. 2020), where our Supreme Court held that when a party recognizes an error but fails to preserve that error, a trial court may then exercise its *sua sponte* authority only where an "exceedingly clear error" results in "manifest injustice." There, the plaintiff's

mother was a resident at a nursing home. After she fell down a ramp and suffered injuries, the plaintiff filed a complaint on his mother's behalf against the nursing home for negligence. At the jury trial, issues arose about (1) the admission of evidence about understaffing of the facility; (2) testimony about the nursing home's "star rating," and (3) plaintiff's closing argument. The nursing home objected to each issue but never moved for a mistrial, choosing instead to proceed with the trial. At the end of trial, the jury found the nursing home negligent and awarded compensatory damages. After the verdict, the nursing home filed a post-trial motion for a new trial that was granted, in part, based on the above unpreserved issues. On appeal, this Court affirmed, finding that the nursing home's failure to request a mistrial did not preclude the trial court's power to *sua sponte* order a new trial.

Our Supreme Court reversed, finding that the trial court abused its discretion in granting the nursing home a new trial. After first finding the nursing home did not properly preserve a request for a mistrial during trial, the Court addressed whether "the trial court did grant, or even could have granted, a new trial on the strength of its *sua sponte* authority." **See Temple**, 233 A.3d at 764.

To answer this, the Court noted that it has "long recognized that trial courts 'are not prevented ... from granting *of themselves* a new trial, if from a view of the evidence they see reason for it.'" **Id.** at 765 (quoting **Ewing v. Tees**, 1 Binn. 450, 455-56 (Pa. 1808)). While **Temple** was an appeal

involving a civil case, our Supreme Court noted that this authority was recognized in **Powell** that a trial court may only use this *sua sponte* authority when the "interest of justice" requires it. **Id.** (citing **Powell**, 590 A.2d at 1242). It went on to note that this authority under **Powell** was not limitless and warned:

> Make no mistake, the "interest of justice" standard remains a very high threshold, the invocation of which should occur only in rare circumstances. In **Powell**, for example, the trial court invoked its authority only after the court itself, "albeit unintentionally, coerced the [defendant] to waive his fundamental right to a jury trial and forced him to proceed with counsel who was admittedly ill prepared to present an effective or competent defense." **Powell**, 590 A.2d at 1243. We found that these serious (and prejudicial) errors, which involved the defendant's constitutional rights to representation and a jury trial, supported the trial court's use of its discretion in granting a new trial *sua sponte*. **See id.** at 1244.

**Temple**, 233 A.3d at 765 (some internal citations omitted).

The **Temple** Court then differentiated between errors raised by the trial court independently and those recognized by a party but not preserved. Addressing the former, which would fit under the circumstances presented in **Powell**, the Court clarified:

> For errors recognized independently by the trial court, without any party calling attention to those errors, the "interest of justice" standard remains the threshold by which a trial court must determine whether it can grant a new trial *sua sponte*. In **Powell**, for example, the trial court recognized its own errors and granted a new trial *sua sponte* without the defendant moving for a new trial based upon the errors noted above. **See Powell**, 590 A.2d at 1242 n.4. Today's decision does not disturb or abrogate our ruling in **Powell**, nor does today's decision eliminate the "interest of justice" standard.

*Temple*, 233 A.3d at 765-66.

As for errors recognized by a party but not preserved, the Court concluded that a slightly higher standard was needed for a trial court to grant a new trial *sua sponte*.

> But in an age in which our system relies upon "alert professional representation at trial," when a party *recognizes* an error, but *fails to preserve* that error, the bar for a trial court to grant a new trial *sua sponte* must be even higher than the already substantial hurdle of the "interest of justice." In such a situation, a trial court may exercise its *sua sponte* authority only in truly exceptional circumstances. **A trial court should make such a ruling only where "exceedingly clear error" results in "manifest injustice." That "exceedingly clear error" should be of a constitutional or structural nature, and "manifest injustice" must be of such a magnitude as to amount to a severe deprivation of a party's liberty interest.** Although these requirements are more difficult to prove than the "interest of justice" standard, we reject the notion that today's decision will result in the "virtual elimination of the *sua sponte* power." If a trial court determines that the above-noted conditions are met, then that court can still declare a new trial *sua sponte* based upon that recognized, but unpreserved, error. Additionally, while we do not restrict invocation of this authority to either criminal or civil cases, the point is well taken that such prejudice would seem more likely to occur in the criminal context (though, even in such situations, would be exceedingly rare).

*Id.* at 766 (internal citations omitted, emphasis added).

Under the ***Powell-Temple*** standard then, where none of the parties recognized the errors, the trial court can grant a new trial under the "interest of justice" standard. Where, however, the error in the trial court proceedings was recognized in the trial court that led to the new trial in the "interest of justice," there must be an "exceedingly clear error" of a constitutional or structural nature, *i.e.*, not in accord with law, and the result must be a

- 13 -

"manifest injustice" that amounts to a severe deprivation of a party's liberty interest.[4]

Because the error here—the purported hearsay nature of the statements made by Becher's cousin to members of the motorcycle club that he was coming to "smoke" them when he was not there or aware of the comments and its purportedly severe prejudicial effect—was known by the parties and the court at trial, we find that the standard established in *Temple* for granting a new trial in the "interest of justice" is applicable. We will then conduct our review to see if there is an "exceedingly clear error" of a constitutional or structural nature, *i.e.*, not in accord with law, resulting in a "manifest injustice" if a new trial is not awarded.[5]

_____

[4] The trial court does have the power when a motion for a new trial is made to reverse a verdict if it would result in a serious miscarriage of justice, even when the jury's findings are against the great weight and clear preponderance of the evidence, even though credible evidence supports the findings. "Although, generally, issues of credibility are solely for the jury, [w]hen a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, ... [t]he [trial] court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Commonwealth v. Widmer*, 744 A.2d 745, 752 n.3 (Pa. 2000) at 752 n.3 (citation omitted).

[5] "While the scope of a trial court's discretionary powers to deal with the factual circumstances it confronts is broad, it is not unlimited. It necessarily follows that the requirement that appellate courts defer to that exercise of

## III.

The trial court found that that a new trial was necessary in the "interests

of justice" because:

- The statements by Khaiya that her "cousin" was going to smoke the members of the motorcycle club were inadmissible hearsay to which defense counsel did not timely object.

- That the Commonwealth in closing used those statements to infer motive on Belcher's part.

- That even if those statements were not hearsay, they were so prejudicial that it deprived Belcher of a fair trial.

- Finally, the trial court's precautionary instruction that this testimony did not go to Becher's intent or motive when he entered the fray was insufficient to cure the prejudicial effects of that testimony.

---

discretion is not without limitation either. The propriety of such an exercise of discretion may be assessed by the appellate process when it is apparent there was an abuse of that discretion. It is well settled that a reversible error occurs when an abuse of discretion is committed.

> "Abuse of discretion" is synonymous with a failure to exercise a sound, reasonable, and legal discretion. It is a strict legal term indicating that the appellate court is of the opinion that there was the commission of an error of law by the trial court. It does not imply intentional wrong or bad faith, or misconduct, nor any reflection on the judge but means the clearly erroneous conclusion and judgment--one is that clearly against logic and effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing; an improvident exercise of discretion; an error of law.".

***Powell***, 590 A.2d at 1244. (citations omitted; cleaned up.)

We examine each of these reasons to determine whether any of them individually or in combination justify the grant of a new trial.[6]

**A.**

To determine whether the introduction of the statements was an "exceedingly clear error," we must first determine whether the testimony about the statements was impermissible hearsay. "'Hearsay' is 'a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.'" *In re A.J.R.-H.*, 188 A.3d 1157, 1167 (Pa. 2018) (quoting Pa.R.E. 801(c)). "Under the Pennsylvania Rules of Evidence, hearsay evidence is incompetent and inadmissible unless it meets an exception set

---

[6] Becher also raises several claims of waiver against the Commonwealth, none of which we find convincing. He first argues that except for those objections it raised on the record immediately after the trial court announced its ruling, the Commonwealth should have filed a subsequent motion in the trial court to preserve its arguments. He cites no case law for this proposition in the criminal context, however, and our independent research has uncovered none for the proposition that the Commonwealth must file a motion to preserve its objections to a trial court granting a new trial on grounds it raises *sua sponte*. Second, he argues that the Commonwealth has waived its arguments because its Pa.R.A.P. 1925(b) statement raised "redundant, frivolous, and verbose" claims. While not a model of clarity, the statement was concise enough to allow the trial court to author a comprehensive and cogent Pa.R.A.P. 1925(a) statement explaining its reasoning for granting a new trial, which is the purpose of a Pa.R.A.P. 1925(b) statement. Third, and finally, the Commonwealth's brief is not "woefully underdeveloped" to the point that we need to deem all its issues waived.

forth in the Rules or one prescribed by this Court or statute." *Id.* (citation omitted).

Nevertheless, "[n]ot all remarks which a witness attributes to another person can properly be characterized as 'hearsay.'" *In re I.R.R.*, 208 A.3d 514, 519 (Pa. Super. 2019) (citation omitted).

> An out-of-court statement is not hearsay when it is introduced purely for the purpose of establishing that the statement was made and not to establish its truth. Likewise, an out-of-court statement is not hearsay if it is offered to explain a course of conduct or to reflect the declarant's state of mind.

*Id.* (citation and brackets omitted).

As it seemed to acknowledge, the trial court recognized that the evidence about the cousins' threats was relevant to proving what effect they had on the members of the motorcycle club. *See* TCO at 5 n.3. While recognizing that when admitted the evidence was not necessarily "blatant, inadmissible hearsay," the trial court intuited that the Commonwealth's purpose in admitting the evidence was to later use it in its closing argument to posit the truth of the matter asserted in the statement: that Becher would come and shoot the members in the group.

We note that properly admitted evidence does not turn into improperly admitted evidence, as the trial court seems to suggest, just because an improper conclusion or argument was made based on that evidence. Whether the Commonwealth's unobjected-to closing was improper and so prejudicial that a new trial was warranted in the interest of justice is separate from the

issue of whether the evidence was improperly admitted when it was introduced.[7] However, Khaiya's statements that Becher was coming to "smoke" them was properly admitted, and a new trial in the interest of justice could not be granted on that basis.

**B.**

As mentioned, the trial court found that it was not until the Commonwealth gave its closing argument that its real purpose in admitting the statements—to prove Becher's intent—became apparent. In support of this notion, the trial court emphasized that the Commonwealth mentioned the threats four times during its closing arguments.

After reviewing each of those four instances cited by the trial court, we find none of them supports its finding that the Commonwealth used the statements to disprove Becher's self-defense claim that he came outside in response to Khaiya's statements or that he acted with malice. The first instance came at the beginning of its closing when the Commonwealth summarized the evidence:

_____

[7] The Commonwealth asserts that the cousins' threats could have also been admitted as excited utterances under Pa.R.E. 802(3). The Commonwealth, however, failed to include this claim in its Pa.R.A.P. 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). Even if preserved, it is clear the cousins' statements would not qualify as excited utterances, since they were not "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Pa.R.E. 802(3).

At the beginning of this trial, I told you that the evidence will show that [Becher] and his group pushed this confrontation far further than it needed to go. During the course of the last two weeks, we have shown you that [Becher] and his cousins chased down a group of men that were trying to walk away. **We have shown you Khaiya Richards threatened to get her cousin to go and smoke those men.** We have shown you, that they followed those men all the way out to their cars even as the men were trying to get inside and leave. We have shown you that at that point they pushed, shoved, punched, and attacked those men even though they were doing nothing more than trying to extricate themselves from that situation. We have shown you that no one in the victim's group had any weapons on them, but that [Becher] still pulled his out, swung it around, and then hit somebody with it. Whatever happened after that point happened at his invitation.

T.T. at 1217-18 (emphasis added). There is no dispute that this is an accurate recitation of the evidence of what was presented at trial and was used to describe how the incident unfolded.

The second instance included the "essence" comment that the trial court highlighted as showing that the Commonwealth was using the evidence as proof of Becher's intent. The Commonwealth's full remarks, however, show that it was not made to prove intent, but to respond to Becher's arguments that the motorcycle club members started the whole incident by unjustifiably beating up a drunk patron in front of the club.

The Defense has repeatedly harked on this idea of this Cimino fight. That fight was over, those men were trying to walk away. **You saw that video, they were leaned up against the side of the building, they weren't following anybody until Khaiya Richards started telling them that she was going to get their cousin to "smoke" them. That's the real essence of it.** You can see they stopped after that fight was done, they stayed on the side of the building. But [Becher's] cousin still had to keep all of this going. The fight is a distraction. Everything

- 19 -

that happens after has to be viewed through the lens of them trying to walk away because they did not pose a threat anymore….

*Id.* at 1221 (emphasis added).

Contrary to the trial court's finding then, the "essence" comment was not referring to Becher's action or his intent in eventually shooting the victim. Instead, the Commonwealth made the comment in the context of responding to Becher's argument that the motorcycle club members were the real aggressors of the whole situation, eventually leading to Becher's necessary use of self-defense. To counter that, the Commonwealth merely made the argument that the original fight had ended and the motorcycle club members were not doing anything until Khaiya began threatening them.

The Commonwealth reiterated this point the third time it mentioned the threats in its closing.

> All of those witnesses were upfront about the Cimino fight, they didn't conceal anything about it. And incidentally, only one of them said that he did any stomping and it was because Cimino was clinging to his leg. **They all told you that Chris clocked Khaiya, that they apologized for it, and that they tried to walk away. You saw them drag Chris out, and everybody that was present for the altercation, that was within earshot, told you that Khaiya said that she was going to go and get her cousin to "smoke" all of them**, a detail I will add that William Especto, in particular, could not have fabricated because at the point that he first said it, nobody knew that those two had any sort of the familial relationship.

*Id.* at 1223 (emphasis added).

The final mention of the threats came a little later when the Commonwealth conceded that some of its witnesses testified inconsistently.

At the same time, the Commonwealth urged that these inconsistencies should not detract from their testimony being consistent on "major things."

> So, yes, the Commonwealth's witnesses accounts do have some gaps. Gaps that were shown to you during their testimony, explained to you because we don't have anything to hide. They lost some minor details. **They remember the major things.** They remember Chris was drunk and out of control. They told you that. **They remember that the girls threatened to have their cousin come and smoke them.** They remember being told to leave. They remember corralling Chris to the car. They remembered that as they were loading him in, the girls came back and they started again. …

*Id.* at 1233-34 (emphasis added).

Again, as the full context shows, the Commonwealth did not reference the threats to prove Becher's state of mind or intent. Indeed, like the other instances, the Commonwealth makes no mention of Becher in connection to its reference to the evidence about the threats, focusing instead on the actions of the motorcycle club members and its contention that they were not the aggressors of the events that eventually led to the shooting.

**C.**

Having found that the Commonwealth did not improperly use the evidence in its closing statement to prove Becher's intent, we next address the trial court's conclusion that, in any event, the evidence was inadmissible under Pa.R.E. 403 because whatever relevancy the evidence had was outweighed by its potential for unfair prejudice to support a finding that a new trial was warranted "in the interest of justice."

Pennsylvania Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. However, "[r]elevant evidence may nevertheless be excluded 'if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Commonwealth v. Broaster*, 863 A.2d 588, 592 (Pa. Super. 2004) (citing Pa.R.E. 403).

> Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged.

*Id.* (citation omitted).

As noted, our standard under *Powell-Temple* is whether there was an "exceedingly clear error" of a constitutional or structural nature. Applying that standard here, we cannot find that it was "exceedingly clear" that the relevance of the evidence about the threats was outweighed by its danger of unfair prejudice. Again, as the trial court recognized, the evidence tended to make the existence of a fact that is of consequence to the determination of the action—the effect of the threats on the motorcycle club members and their

course of conduct—more probable. Accordingly, the evidence met the threshold for relevancy under Pa.R.E. 401.

Moreover, we cannot find that the evidence's potential for being unfairly prejudicial outweighed its probative value. The evidence formed an integral part of the history and natural development of the events just before the shooting in explaining what the motorcycle club members had been told. Indeed, as the Commonwealth points out in positing why Becher never sought to exclude the evidence, the jury could infer from the evidence that it was the motorcycle club members (and not Becher) that were the real aggressors because **they** thought Becher was there to "smoke" them when he unwittingly walked into the ongoing altercation. Thus, we conclude that the trial court abused its discretion in finding that the evidence about the statement, even if not admitted for hearsay purposes, was inadmissible under Rule 403.

**D.**

Finally, the trial court found that a new trial was warranted because its precautionary instruction to the jury about the statement made by Khaiya that her cousin was going to "smoke" the motorcycle club members was insufficient to cure the prejudicial effects of that testimony.

As discussed, with the agreement of both parties, the trial court instructed the jury that if it determined that Khaiya did, in fact, make the statement, it could not "regard the statement standing alone as proof of any intent or state of mind of the defendant." T.T. at 1282. The trial court

continued that the jury "may regard that evidence if [it found] that it happened in evaluating and find out other facts that might bear on the events of this case, but the statement made outside the presence of the defendant cannot be proof of the defendant's intent or state of mind unless you determine from the evidence that the defendant was conscious of and promoted the statement, or endorsed that statement in some fashion." *Id.* at 1282-83.

Contrary to the trial court's conclusion after the verdict, we find that the trial court's thoughtful instruction accurately characterized the evidence about the threats. "It is well settled that the jury is presumed to follow the trial court's instructions." *Commonwealth v. Cash*, 137 A.3d 1262, 1280 (2016). Here, the trial court properly instructed the jury that the evidence about the threats, if found to be credible, still had no relevance concerning Becher's intent or state of mind unless it also found that Becher knew about the threats. Of course, as the Commonwealth stresses, there was no evidence of the latter, nor did it argue at any point in its closing statement that Becher knew about the threats and acted in accordance with them. Under our well-settled law, we must presume that the jury followed the trial court's instruction and did not misuse the evidence about the threats as evidence of Becher's intent since there was no evidence that he was present or knew about the threats when they were made.

For the foregoing reasons, we hold that the trial court abused its discretion in granting Becher a new trial "in the interest of justice" on grounds that Becher recognized but never reserved. Again, under the **Temple** standard, for the trial court to have authority to grant a new trial under these exceptional circumstances, there needed to be an "exceedingly clear error" that resulted in "manifest injustice." No such "exceedingly clear error" happened here where the Commonwealth admitted evidence about threats relevant for their effect on the hearer (the motorcycle club members), and any possibility of prejudice was cured by the trial court's limiting instruction that the jury is presumed to have followed. As our review indicates, even if the "interest of justice" standard under **Powell** applied here where no one recognized the error involved, we would still not hold that the proceeding below would have justified the standard because none of the reasons cited for a new trial involve error, let alone clear error.

Accordingly, we reverse the trial court's order granting Becher a new trial and remand for the trial court to address Becher's motion for a new trial based on that it was against the weight of the evidence.

Order reversed. Case remanded with instructions. Jurisdiction relinquished.

Judge Olson joins the Opinion.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/4/2023