J-A18008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                      :            PENNSYLVANIA
                                      :
           v.                             :
                                      :
                                      :
MAXWELL J. LUPERI                   :
                                      :
             Appellant            :     No. 1066 EDA 2024

Appeal from the Judgment of Sentence Entered November 22, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0000670-2022

BEFORE: OLSON, J., DUBOW, J., and BECK, J.

MEMORANDUM BY OLSON, J.:            **FILED DECEMBER 23, 2025**

Appellant, Maxwell J. Luperi, appeals from the judgment of sentence following his jury trial convictions for sexual assault, deviate sexual assault, and three counts of indecent assault.[1] After careful review, we affirm.

The trial court summarized the facts and procedural history of this case as follows:

> On September 4, 2021, the Radnor Police Department received a call from Paoli Hospital reporting a sexual assault victim that was in the Emergency Department. The assault allegedly occurred at East Hall at Cabrini University. Officer Stephanie Racht of the Radnor Police Department, met with [Sexual Assault Nurse Examiner] Renee Postles who informed Racht that the victim wanted to remain anonymous and did not want to get police involved in the matter. However, on October 13, 2021, the Radnor Police Department was contacted by the Delaware County

---

[1] 18 Pa.C.S.A. §§ 3124.1 (proscribing both sexual intercourse and deviate sexual intercourse without consent) and 3126 (indecent assault). The jury also found Appellant not guilty of simple assault pursuant to 18 Pa.C.S.A. § 2701.

>Victim's Assistance Center regarding a female [sexual assault] victim who wanted to come forward. The Radnor Township Police Department was able to determine that this victim was the same one who was in Paoli Hospital Emergency Room on September 4, 2021. Detectives Jonathon Jagodinski and Thomas Schreiber, both employed by the Radnor Township Police Department, conducted an interview with this victim, [C.D.[2]] During this interview on October 13, [2021,] Victim explained what happened, and was shown a photo of [Appellant], Maxwell Luperi, whom she identified as the subject involved in the incident. [] Victim then initialed the photograph of [Appellant]. On October 15, 2021, Detective Jagodinski served a search warrant to Cabrini University for reports and/or records related to [] the incident. Detective Jagodinski reviewed [] Victim's recorded interview on September 8, 2021 with Cabrini University Public Safety Investigator, Mary Anders, and determined that the information [] Victim provided during that interview was consistent with what she told him during their interview on October 13[, 2021]. Detective Jagodinski also reviewed Mary Anders' recorded interview with [Appellant], in which he acknowledges that he had vaginal and anal sex with [] Victim, and that she was bleeding a lot. He also stated in this interview that "he assumed he was involved when he learned that there was a rape in East Residence Hall upon his return to campus."

Trial Court Opinion, 8/13/2024, at 1-2 (original brackets, footnote, and record citations omitted).

Following a trial commencing on May 30, 2023, a jury found Appellant guilty of the aforementioned charges, but not guilty of simple assault. On November 22, 2023, the trial court imposed an aggregate sentence of 11½ to 23 months of incarceration, followed by five years of probation. At this time, the trial court also determined that Appellant met the criteria for designation as a sexually violent predator (SVP), a finding that called for lifetime

---

[2] We refer to the victim as "Victim" or by her initials to protect her identity. Appellant generally refers to her as the complainant.

registration under the Sexual Offender Registration and Notification Act (SORNA). ***See*** 42 Pa.C.S.A. § 9799.14(d)(2). This timely appeal resulted.[3]

On appeal, Appellant presents the following issues for our review:

_____

[3] On December 1, 2023, Appellant filed a timely post-sentence motion challenging the weight of the evidence and his SORNA lifetime registration requirement. Appellant's motion remained outstanding until, on March 26, 2024, the trial court entered an order generally denying relief, but staying imposition of a registration requirement pending a ruling by the Pennsylvania Supreme Court in ***Commonwealth v. Torsilieri***, 316 A.3d 77 (Pa. 2024), which was ultimately decided on May 31, 2024. Appellant's SVP designation, however, is not currently before this Court. Because Appellant's registration requirement remained unresolved by the trial court's March 26, 2024 order, that order did not completely dispose of Appellant's post-trial motions. Pursuant to Pa.R.Crim.P. 720(B)(3)(a), however, the trial court was required to "decide the post-sentence motion, including any supplemental motion, within 120 days of the filing of the motion." Pa.R.Crim.P. 720(B)(3)(a). Because "the judge fail[ed] to decide the [entire] motion within 120 days, or to grant an extension [], the motion [was] deemed denied by operation of law" on March 30, 2024. ***Id.*** Accordingly, "the clerk of courts [was required] to enter an order on behalf of the court … that the post-sentence motion [was] deemed denied" in its entirety. Pa.R.Crim.P. 720(B)(3)(c). Here, the clerk of courts did not enter an order deeming Appellant's post-sentence motion denied, nor did the clerk's office notify Appellant of the denial of his motion by operation of law. Ordinarily, "[i]f the defendant files a timely post-sentence motion, the notice of appeal shall be filed [] within 30 days of the entry of the order denying the motion by operation of law in cases in which the judge fails to decide the motion." Pa.R.Crim.P. 720(A)(2)(b). However, "[t]his Court has previously held that, where the clerk of courts does not enter an order indicating that the post-sentence motion is denied by operation of law and notify the defendant of same, a breakdown in the court system has occurred and we will not find an appeal untimely under these circumstances." ***Commonwealth v. Perry***, 820 A.2d 734, 735 (Pa. Super. 2003) (citation omitted). Thus, when Appellant filed his notice of appeal on April 1, 2024, one-day after our Supreme Court decided ***Torsilieri***, we consider the notice of appeal timely filed. On April 26, 2024, the trial court directed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely on May 17, 2024. On August 13, 2024, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

1. Did the trial court err by refusing to ask the members of the jury pool whether they are more likely to believe the testimony of a sexual assault complainant?

2. Did the trial court err by denying [Appellant's] motion to strike juror number 35 for cause after the juror indicated he would be more likely to believe the testimony of a law enforcement officer?

3. Was the evidence insufficient as to the [element] of non-consent where even the complaining witness admitted that the non-consent was not clear?

4. Even if the evidence was sufficient to support [Appellant's] convictions, did the trial court err when it denied [Appellant's] post-sentence motion challenging the weight of the evidence?

Appellant's Brief at 3.

Appellant's first two issues challenge the trial court's rulings pertaining to jury *voir dire* and, therefore, we employ the following standard of review:

The Sixth and Fourteenth Amendments guarantee a defendant the right to, *inter alia*, an impartial jury, and this right extends to both the guilt and sentencing phases of trial. Thus, the jury selection process is crucial to the preservation of a criminal defendant's constitutional right to an impartial jury.

*Voir dire* plays a critical function in assuring the criminal defendant that his right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.

While this Court has explained that the scope of *voir dire* is within the sound discretion of the trial court, the United States Supreme Court has stated that the exercise of the trial court's discretion is subject to the essential demands of fairness.

Moreover, the purpose of *voir dire* is solely to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court. *Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies.

- 4 -

The decision whether to disqualify a prospective juror is to be made by the trial judge based on the juror's answers and demeanor and will not be reversed absent a palpable abuse of discretion. Appellate courts defer to the trial court's assessment of a prospective juror's answers during *voir dire* because the trial court is in the best position to assess the prospective juror's credibility and fitness to serve.

Most importantly, we should give great weight to the trial court judge's decision about striking jurors because the trial court judge not only hears the words that the potential juror speaks, but also the manner in which the juror says those words and is in a better position than an appellate court to evaluate the significance of any hesitancy of a potential juror:

> The juror appears before the trial judge, who sees him and hears what is said; and is able to form his opinion as much from the proposed juror's conduct as from the words which he utters, printed in the record. Hesitation, doubt, and nervousness indicating an unsettled frame of mind, with other matters, within the judge's view and hearing, but which it is impossible to place in the record, must be considered. As it is not possible to bring these matters to our attention, the trial judge's view should be given great weight in determining the matters before him.

*Commonwealth v. Delmonico*, 251 A.3d 829, 839–840 (Pa. Super. 2021)

(internal citations, quotations, ellipses, and original brackets omitted).

Moreover,

[i]t must be remembered the purpose of the *voir dire* examination is to provide an opportunity to counsel to assess the qualifications of prospective jurors to serve. It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. Thus the inquiry must be directed at ascertaining whether the venireperson is competent and capable of rendering a fair, impartial and unbiased verdict. The law also recognizes that prospective jurors were not cultivated in hermetically sealed environments free of all beliefs, conceptions and views. **The question relevant to a determination of qualification is whether any biases or prejudices can be put aside upon the proper instruction of the court**.

A challenge for cause to service by a prospective juror should be sustained and that juror excused where that juror demonstrates through his conduct and answers a likelihood of prejudice. The decision whether to disqualify a venireman is within the discretion of the trial court and will not be disturbed on appeal absent a palpable abuse of that discretion.

**Stated another way, the test of disqualification is the juror's ability and willingness to eliminate the influence of his scruples and render a verdict according to the evidence**. This determination is to be made by the trial judge based on the juror's answers and demeanor and will not be reversed absent a palpable abuse of discretion.

*Commonwealth v. Penn*, 132 A.3d 498, 502 (Pa. Super. 2016) (internal citations, footnote, and quotations omitted; emphasis added).

In his first issue presented, Appellant claims that the trial court abused its discretion when it denied his general request "to ask prospective jurors whether anyone was more likely to believe a sexual assault complainant's testimony." Appellant's Brief at 7. More specifically, Appellant posits:

In this case, the circumstances of the particular alleged criminal episode warranted the requested defense question. The case was about whether the jury would believe [the complainant], a young female who alleged that she was sexually assaulted on a college campus by a young man. As a general matter, asking whether any jurors have predilections to credit such a witness' testimony is no different than asking if anyone would be more likely to believe a law enforcement officer [as argued in Appellant's second appellate issue presented].

In this particular case, however, the prevalent public and social pressures in existence at the time of trial made it imperative that the defense be allowed to ferret out bias. The incident in this case happened at the height of the #MeToo movement, when for many the conventional wisdom became that sexual assault complainants were [] presumptively [to] be believed. A general question about whether a juror would be more likely to believe a sexual assault victim was entirely appropriate.

*       *       *

- 6 -

[I]t was a non-intrusive, narrowly tailored, limited question that could in and of itself yield[] crucial information that would have affected the jury selection process. By refusing to [permit] this general [inquiry of] the jury pool, the trial court palpably abused its discretion.

*Id.* at 9-10. Appellant suggests he was prejudiced because "[t]he ultimate makeup of the jury included four young college aged women and no college aged men." *Id.* at 10 n.5.

On this issue, the trial court stated:

[it] informed jurors at the beginning of the jury selection process of the nature of the charges alleged. Additionally, [the trial c]ourt went a step further [] and asked jurors during *voir dire* whether they or anyone they knew had been the victims of or accused of a crime similar to the ones alleged in [this] case. [The trial court] then went on to examine the jurors individually who indicated potential conflicts, and effectively determined whether each one could remain fair and impartial. Jurors who were viewed as not being able to do so were ultimately not chosen. In light of these facts, absent any proof of palpable error, the exclusion of a question during the *voir dire* process as to whether the jurors would be more likely to believe the testimony of a person who says they were sexually assaulted was not an abuse of discretion[.]

Trial Court Opinion, 8/13/2024, at 7-8 (record citations omitted).

We agree with the trial court's assessment. Our Supreme Court has previously determined that there was no error in denying a request to ask potential jurors if "you or anyone close to you has ever been the victim of sexual assault" where the trial court also disclosed that the case involved a sexual assault and then individually asked each venireperson if there were any reasons that would prevent them from being fair. *See Commonwealth v. Ellison*, 902 A.2d 419, 427–428 (Pa. 2006). The *Ellison* Court ultimately

"declined to hold trial judges to a script in conducting *voir dire* examination" and held that "trial judges may pose those questions that serve the purpose of revealing whether prospective jurors are able to provide the accused with competent, fair, impartial, and unprejudiced consideration." **Id.** at 428. Moreover, lending further support for our decision herein, on September 25, 2025, our Supreme Court decided **Commonwealth v. Smith**, -- A.3d --, 2025 WL 2724797 (Pa. 2025). Therein, our Supreme Court found that a general *voir dire* question of whether jurors were more likely to believe a child abuse victim was not warranted "based on the lack of a foundation supporting the existence of such bias [and, therefore,] the trial court did not abuse its discretion in refusing this supplemental oral question." **Smith**, at *12 (declining to recognize a societal bias in favor of the truthfulness of child victims of sexual abuse).

Here, upon review of the record, the trial court disclosed that this case involved a sexual assault. **See** N.T., 5/30/2023, at 11. The trial court individually asked potential jurors if they could remain fair and impartial. **See id.** at 32, 37, 41, 51, 53, 55, 58, 60, 63, 66, 68, 69, 70-71, 72-73, 76-77, 82, 87, 89, 104, 108, 114, 117, 120, 123, 127, 131, 136, 145, 147, 150, 151, 155, 156, 158, 165, 170, and 172. The trial court identified potential juror biases and/or prejudices and asked if those biases and/or prejudices could be put aside upon proper instruction of the court. Those who were eventually seated on the jury said they could put aside their bias and render a verdict based solely upon the evidence presented at trial. As such, the trial court did

not abuse its discretion when it precluded defense counsel from specifically asking prospective jurors whether anyone was more likely to believe a sexual assault complainant's testimony.  Accordingly, Appellant's first issue is without merit.

In his next issue presented, Appellant argues that the trial court abused its discretion when it denied his motion to strike Juror No. 35 for cause after the prospective juror answered, on a printed *voir dire* form, that he would be more likely to believe the testimony of a police officer than other witnesses. Appellant's Brief at 11-13.  Appellant asserts that "Juror number 35 had two friends who worked in law enforcement and a family member who worked as a corrections officer," which showed his bias for the police.  ***Id.*** at 14. Appellant also maintains that Juror No. 35 served on three previous juries but still indicated "a predisposition to believe a law enforcement officer just by virtue of how that witness was employed."  ***Id.*** at 15.  As such, Appellant contends that Juror No. 35 was unable to set aside his bias and that Appellant did not receive a fair trial as a result.[4]  ***Id.***

_____

[4]  In relation to this claim of juror bias, Appellant also suggests that he "was still prejudiced" by testimony and evidence presented at trial.  Appellant's Brief at 17.    More specifically, Appellant claims that the report and trial testimony of Mary Anders, the public safety officer at Cabrini University who interviewed the complainant, "was intentionally deceptive and skewed in order to bolster a case against" Appellant.  ***Id.***  Appellant claims that Anders' report contains numerous "utter fabrication[s]" and "deceptive[] omi[ssions]."  ***Id.*** at 17-20.  Appellant also alleges that Detective Jagodinski "was called to testify in order to bolster the Commonwealth's narrative that [the complainant's] allegations were vetted and found to be truthful by law
*(Footnote Continued Next Page)*

Ultimately, the trial court denied Appellant's motion to strike for cause because it determined that Juror No. 35 could put aside any preconceptions and render a verdict based upon the evidence. The trial court acknowledged that Juror No 35 initially answered by stating, on the printed *voir dire* questionnaire, that he would more likely believe an officer's testimony because of his job, however, "when asked about this during individual *voir dire*[,] Juror [No.] 35 stated that he understood and would follow the instruction that the testimony of a police officer must be given the same weight as that of a non-police officer." Trial Court Opinion, 8/13/2024, at 9; ***see also*** N.T., 5/30/2023, at 116. Moreover, the trial court recognized that Juror No. 35 "also confidently stated that he would be able to remain a fair and impartial juror." Trial Court Opinion, 8/13/2024, at 9; ***see also*** N.T., 5/30/2023, at 117. Here, the *voir dire* examination revealed Juror No. 35's fixed opinion about police officers but, recognizing that prospective jurors are not cultivated in hermetically sealed environments free of all beliefs, conceptions and views, the trial court then conducted inquiry into ascertaining whether Juror No. 35

_____

enforcement such that charges against [Appellant] were warranted" and that the affidavit of probable cause filed in this matter "was merely a cut-and-paste job from Anders' untruthful report." ***Id.*** at 20. Because Appellant never raised these evidentiary concerns before the trial court and did not raise them in his subsequent Rule 1925(b) statement, these contentions are waived. ***See*** Pa.R.A.P. 302(a) ("Issues not raised before the trial court are waived and cannot be raised for the first time on appeal."); ***Commonwealth v. Wallace***, 289 A.3d 894, 908 (Pa. 2023) (failure to object and raise an issue before the trial court waives it on appeal); ***Commonwealth v. Butler***, 446, 812 A.2d 631, 634 (Pa. 2002) (any issues not raised in a Rule 1925(b) statement are waived). As such, we will not consider these additional arguments.

was competent and capable of rendering a fair, impartial and unbiased verdict. The trial court determined that Juror No. 35 qualified as a juror because he stated that he could put aside any biases or prejudices upon the proper instruction of the court, was willing to eliminate the influence of his scruples, and would render a verdict according to the evidence. *See* N.T., 5/30/2023, at 118 (stating it was not the practice of the court to excuse all jurors for bias merely because the potential venireperson initially indicates he or she may believe a law enforcement officer over other witnesses because "[i]f they say they'd follow [the] instruction[s of the court] – it's not where they start out, it's where they finish."). Upon review, we discern no abuse of discretion in determining that Juror No. 35 qualified as a juror and, therefore, it was proper to deny Appellant's motion to strike for cause. As such, Appellant's second issue does not warrant relief.

Next, Appellant posits that the evidence presented at trial was insufficient to support his convictions. Appellant's Brief at 22-29. Appellant argues that his "convictions must be set aside because the verdict below was based upon speculation and conjecture [because the] Commonwealth specifically failed to prove lack of consent." *Id.* at 23. Appellant maintains that, after the incident in question, the complainant immediately "questioned the clarity of her communication to [Appellant] regarding consent" when "she told her mother, two residential advisors, and her friend that she was not clear enough in her communication with" Appellant and that "[s]he told others that [Appellant] did not understand she was not consenting." *Id.* at 25-26.

Appellant contends that if the complainant "herself knew that she did not express her lack of consent, then it is nonsensical to assume that [Appellant] was supposed to read her mind." *Id.* at 27. Appellant claims that the complainant "never said 'no' or 'stop' during the encounter, she never tried to leave [Appellant's] room or end the encounter, and [Appellant] did not use force, threats, or coercion during the encounter." *Id.* at 25. Appellant states that the complainant suggested meeting at Appellant's room and then voluntarily got onto his bed and that the evidence showed that when Appellant put his arm around the complainant, she moved closer to him and engaged in consensual kissing. *Id.* at 24-25. Appellant asserts that while engaged in consensual kissing, he asked the complainant if she was okay and she said "yeah." *Id.* Appellant acknowledges that when asked if she wanted to take things further, the complainant replied, "I don't think so" but she also admitted at trial that "she continued to participate in the encounter by kissing [Appellant], taking off some clothing, and requesting that he put on a condom." *Id.* More specifically, Appellant claims that when Appellant inserted his fingers into the complainant's vagina "she continued to kiss and make out with him" and then took her flannel overshirt off. *Id.* at 25. Thereafter, Appellant argues that the complainant asked him to put on a condom before they engaged in vaginal intercourse and Appellant complied. *Id.* Later, "[d]uring anal sexual intercourse, [when complainant] expressed pain, [Appellant] responded by ending his participation in anal intercourse" and when the entire encounter concluded Appellant "apologized for the sexual

encounter being so short." *Id.* at 25-26. Accordingly, Appellant contends that "[i]n the absence of some indication to [Appellant] that what he was allegedly doing was unwarranted, the Commonwealth has wholly failed to establish the *mens rea* required to sustain his convictions." *Id.* at 26. Appellant maintains that there was no evidence that he acted intentionally, knowingly, or recklessly. *Id.* at 27. Finally, Appellant argues that the complainant's mother "warped" the complainant's "concept of consent" by telling her that consent "doesn't exist unless it is 'enthusiastic' and that 'consent is more than just the initial saying yes.'" *Id.* at 26.

"A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review under a *de novo* standard." ***Commonwealth v. Smith***, 234 A.3d 576, 581 (Pa. 2020). We employ the following standards:

> In evaluating a challenge to the sufficiency of the evidence, we are to view all of the evidence admitted at trial in the light most favorable to the verdict winner, along with any reasonable inferences to be drawn therefrom. We must then determine whether the evidence was sufficient to have permitted the trier of fact to find that the Commonwealth established each and every element of the crimes charged beyond a reasonable doubt. The facts and circumstances presented at trial need not preclude every possibility of innocence. [We view the evidence presented] in the light most favorable to the Commonwealth as verdict winner[.]

***Commonwealth v. Prince***, 719 A.2d 1086, 1088 (Pa. Super. 1998) (internal citations omitted).

Sexual assault is statutorily defined as follows:

[A] person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

18 Pa.C.S.A. § 3124.1.

Indecent assault is statutorily defined, in pertinent part, as follows:

A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

(1)	the person does so without the complainant's consent[.]

18 Pa.C.S.A. § 3126.

Section 311 of the Crimes Code (derived from Section 2.11 of the Model Penal Code), provides that "[t]he consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negat[es] an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense." 18 Pa.C.S.A. § 311(a). "The crime of sexual assault requires the Commonwealth to prove beyond a reasonable doubt that the defendant engaged in sexual intercourse or deviate sexual intercourse with the complainant, *and that the complainant did not consent*." **Prince**, 719 A.2d at 1090 (emphasis in original), *citing* 18 Pa.C.S.A. § 3124.1. Like sexual assault, the crime of indecent assault requires the Commonwealth to prove beyond a reasonable doubt that the defendant engaged in indecent assault with the complainant and *did so without the*

*complainant's consent. **See** 18 Pa.C.S.A. § 3126 (emphasis added). "In other words, lack of consent is an element of the crime[s] charged." **Prince**, 719 A.2d at 1090. Accordingly, we have determined that "[w]hile a defendant may assert consent as a defense, nevertheless, where lack of consent is an element of the crime, the defendant does not bear the burden of proving consent: *the Commonwealth bears the burden of proving lack of consent, beyond a reasonable doubt*." **Id.** (emphasis in original). "Lack of consent is all that criminalizes the acts at issue, in situations in which the only evidence often will be the conflicting testimony of the parties who engaged in the acts." **Id.** at 1091. As such, our Court has previously determined that a defendant is "entitled to a focused [jury instruction] on consent, [] emphasizing specifically where the burden lay." **Id.** More specifically, Pennsylvania Suggested Standard Jury Instruction (Crim) 8.311B provides:

> (1) The consent of the victim is a defense to [] charge[s, including sexual assault and indecent assault]. **Consent is present if the victim at the time of the alleged crime is willing** [to engage in these activities] **and makes his or her willingness known to the defendant by words or behavior**.
>
> *           *           *
>
> (4) **The burden is on the Commonwealth to prove beyond reasonable doubt that the alleged victim did not give consent.** Thus you cannot convict the defendant unless you are satisfied beyond a reasonable doubt that [Victim] did not give consent.

Pa.S.S.J.I. (Crim.) 8.311(B) (Consent a Defense) (emphasis added).[5]

The defense of consent pursuant to 18 Pa.C.S.A. § 311, is "to be viewed from the perspective of a person of reasonable resolution in the victim's peculiar situation, considering subjective factors." *Commonwealth v. Mlinarich*, 542 A.2d 1335, 1347 (Pa. 1988) (opinion in support of affirmance). "Resistance to the sexual assault is not a requisite for sustaining a conviction for sexual assault." *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015), *citing Commonwealth v. Andrulewicz*, 911 A.2d at 162, 165–66 (Pa. Super. 2006). A victim's verbal expression that the

---

[5] Here, there is no dispute that the trial court properly instructed the jury regarding consent as follows:

> The consent of the victim. The consent of the victim is a defense to a charge of sexual assault. Consent is present if the victim, at the time of the alleged crime, is willing to have intercourse and makes her willingness known to the Defendant by words or behavior. The consent of the victim is not legally effective and it is not a defense if the victim is, A, manifestly unable to make a reasonable judgment as to the nature or the harmfulness of the conduct charged that constitutes the crime, or B, known to the Defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged that constitutes the crime by reason of the victim's youth, or mental disease or defect, or intoxication. Additionally, the consent of the victim is not legally effective and is not a defense if it is induced by force, or duress, or deception. The burden is on the Commonwealth to prove beyond a reasonable doubt that the alleged victim did not give a legally effective consent. Thus, you cannot convict the Defendant unless you are satisfied beyond a reasonable doubt that [C.D.] did not give a legally effective consent.

N.T., 6/2/2023, at 92-93. Appellant does not challenge the jury instruction given.

defendant's conduct is unwanted is enough to evidence her lack of consent. *See*, *i.e.*, **Commonwealth v. Aidoo**, 307 A.3d 635 (Pa. Super. 2023) (non-precedential decision).[6]   Moreover, this Court has held "that the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant."  **Andrulewicz**, 911 A.2d at 166, *citing* **Commonwealth v. Charlton**, 902 A.2d 554, 562 (Pa. Super. 2006). "[I]t is for the fact finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony." **Id.** (citation omitted); **see also Gonzalez**, 109 A.3d at 724 ("Conflicts between the testimonies of the victim and [defendant] are for the jury to resolve, and review of the jury's credibility determinations is not for the trial court to undertake.").   Further, the factfinder is "free to accept [a victim's] characterization of what transpired with [the defendant], particularly [a] representation that [the defendant] 'raped' her, which connotes a lack of consent to the act committed." **Andrulewicz**, 911 A.2d at 166.

Furthermore, this Court has previously determined that because Sections 3124.1 (sexual and deviate sexual assault) and 3126 (indecent assault) do not "define the mental state sufficient to establish the defendant's guilt, the Commonwealth [is] required to prove that [the defendant] acted intentionally, knowingly, or recklessly with respect to each material element of the [sexual] offenses." **Commonwealth v. Weaver**, 309 A.3d 1024, at

_____

[6]  We may cite non-precedential decisions, filed in this Court after May 1, 2019, for their persuasive value.  **See** Pa.R.A.P. 126(b).

*3 (Pa. Super. 2023) (non-precedential decision) *citing* 18 Pa.C.S.A. § 302(c);

***A.L. v. Pennsylvania State Police***, 274 A.3d 1228, 1240 (Pa. 2022)

(indicating that the offense of sexual assault requires at least a finding of

recklessness pursuant to 18 Pa.C.S.A. § 302(c)); ***Commonwealth v. Carter***,

418 A.2d 537, 540-541 (Pa. Super. 1980) (stating that because the indecent

assault statute is silent as to the culpability sufficient to establish the crime,

18 Pa.C.S.A. § 302(c) requires that the Commonwealth establish that the

defendant acted, at a minimum, recklessly with respect to the material

elements of the offense).   Recklessness, which requires the lowest level of

proof among the three levels of intent, is defined in the Crimes Code as

follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

***Weaver***, 309 A.3d 1024, at * 3, *citing* 18 Pa.C.S.A. § 302(b)(3).

Here, on this issue, the trial court determined that "the Commonwealth's

evidence was sufficient for the jury to find that [] Victim did not consent to

intercourse with [Appellant]."   Trial Court Opinion, 8/13/2024, at 13.   More

specifically, the trial court recounted:

> At trial, the Commonwealth presented [] Victim's testimony.   She testified that when [Appellant] initially attempted to kiss her, she 'pulled away' because that 'wasn't what she came over to do.'   [] Victim then testified that while [Appellant] was attempting to kiss

- 18 -

her and had his hand in her pants, she stated three times 'I thought we were watching a movie.' [] Victim also stated at trial that when [Appellant] asked her if she 'wanted to take things further' she replied, 'I don't think so.' She also stated that she did not feel as though she could move, as [Appellant] was on top of her, and her arms were crossed over her chest. Additionally, once [] Victim began to bleed and was in pain from vaginal intercourse, she testified that she expressed this to [Appellant] and this led him to put his penis in her rectum. This led her to scream in pain, and [Appellant] put his penis back in her vagina. [] Victim again stated to [Appellant] that she was bleeding and needed to take care of it, and [Appellant] got up and got a towel to put under her[, but then continued having vaginal intercourse[.]

*Id.* at 12 (record citations and original brackets omitted).

Upon extensive review of the certified record, specifically the notes of testimony from trial, as well as applicable law, and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we conclude that the trial court did not err as a matter of law or abuse its discretion in finding sufficient evidence to support Appellant's convictions. Victim testified that Appellant put his arm around her and kissed her three times. After each time, Victim said, "I thought we were watching a movie." N.T, 5/31/2023, at 52-55. Victim testified that Appellant then digitally penetrated her vagina while she remained "frozen… tense, awkward, uncomfortable, [and] rigid." *Id.* at 55. She stated again, however, "I thought we were watching a movie." *Id.* Victim testified that Appellant "raised [her] tank top enough to bite [her] breast," asked Victim if she wanted him "to take this further" and she said, "I don't think so" without hesitation. *Id.* at 56. Appellant pulled Victim's pants down and took off his shorts. *Id.* at 57-58. Victim testified that she was

"kind of in panic mode" and "had said, are you at least going to wear a condom?" *Id.* at 59. She testified that she did not feel safe and did not feel like she could get away. *Id.* at 61. Appellant inserted his penis into Victim's vagina, and she told him twice that she was bleeding and that it hurt. *Id.* at 63. Victim testified that Appellant "took his penis out of [her] vagina, and he placed it in [her] rear" without permission or discussion. *Id.* at 64. Victim "screamed, because it hurt" and Appellant "took it out and put it back in [her] vagina." *Id.* Victim "then mentioned again that [she] was bleeding, and [she] needed to go take care of it." *Id.* "Within seconds there was a towel underneath [her], to protect the blood from staining things, and [Appellant] continued" having sex with her. *Id.* at 65. Immediately after the encounter, Victim called her best friend and told her that she thought she "was just raped."[7] *Id.* at 68. Victim also told her mother who took her to the emergency room at the local hospital. *Id.* at 69. Victim, however, admitted on cross-examination that she told both campus investigator, Mary Anders, and Detective Jagodzinski that she was "okay" with the kissing and that at some point she removed her own flannel shirt. *Id.* at 107-108, 110-111. Victim testified that although she initially told her best friend, her residence assistant, and her mother that she was not sure if she was clear enough with Appellant

_____

[7] Victim's friend testified similarly at trial. *See* N.T, 5/31/2023, at 178-179 ("[S]he was crying, and visibly shaking. She had told me [] I think I was raped."); *id.* at 179-180 ("I have never seen her like that. She was really, really afraid. She was shaking, and she was stuttering over her words, and she was crying the whole time.").

regarding consent, it was because her "first instinct was to blame herself" and that she later realized that "consent is more than just the initial saying yes."[8] *Id.* at 131-134.

Initially, we note that Victim's testimony, even if uncorroborated, was sufficient to support Appellant's convictions. *See Andrulewicz*. The jury was free to believe all, some, or none of her testimony, conflicting testimony was for the jury to resolve, and the trial court was not permitted to usurp the jury's credibility determinations. *See Andrulewicz* and *Gonzalez*. Moreover, the jury was free to accept Victim's characterization of what transpired, which she described to others as rape and which connoted a lack of consent to the acts committed. *See Andrulewicz*. Other witnesses testified that Victim was distraught immediately after the incident and confirmed that she believed she had been raped. Further, Victim did not have to physically resist in order to prove her non-consent. *See Gonzalez*.

Moreover, as discussed above, the trial court properly instructed the jury about consent. The jury was told that consent was present if Victim, at the time of the alleged crimes, made her willingness to participate known by words or behavior. "It is well settled that the jury is presumed to follow the trial court's instructions." *Commonwealth v. Becher*, 293 A.3d 1226, 1240

_____

[8]  Victim's friend testified that Victim "was worried that because she didn't say no, that it wasn't clear enough to [Appellant], but [Victim] thought because she had told multiple times that she was in pain, and that she was bleeding, that that was enough for him to know that she didn't want to do it." *See* N.T, 5/31/2023, at 183.

(Pa. Super. 2023). Here, Victim testified that she told Appellant she did not think she wanted to go further than kissing and consistently stated that she wanted to watch a movie instead. Viewed from the perspective of a person of reasonable resolution in Victim's peculiar situation, and considering subjective factors, such testimony was sufficient to show that Appellant's conduct was unwanted and that Victim was not willing to engage in sexual intercourse.[9] *See Mlinarich* and *Aidoo.* Appellant consciously disregarded

_____

[9] Even if the jury believed that Appellant and Victim engaged in consensual kissing and that Victim removed an item of her own clothing during the encounter, we have previously determined that two competent adults may engage in some intimacy (*i.e.*, kissing and touching) even in instances where the victim initiates contact, voluntarily goes into the defendant's bedroom, and follows some direction by the defendant, but that such actions do "not undermine the sufficiency of the evidence" to support convictions for sexual assault and indecent assault. *Gonzalez*, 109 A.3d at 722. ("Gonzalez's contention that K.M. initiated sexual intercourse and that he followed her directions does not undermine the sufficiency of the evidence."), *citing Andrulewicz*, 911 A.2d at 166 ("the court was free to accept [the victim's] characterization of what transpired with [a]ppellant, particularly her representation that [a]ppellant 'raped' her"); *Commonwealth v. Filer*, 846 A.2d 139, 141 (Pa. Super. 2004) (victim's testimony that defendant digitally penetrated her was sufficient evidence for jury to find defendant guilty of aggravated indecent assault despite defendant's different version of events). Moreover, Victim asking Appellant to wear a condom is not evidence of consent. *See*, *i.e.*, *Prince*, 719 A.2d at 1088-1089 ("[Victim] realized that he was going to force her to have sex and became frightened. She was afraid to scream or do anything because there was nobody there to help her and the defendant becomes violent when he drinks and/or does not get what he wants. Fearing AIDS and venereal disease she said to defendant, 'if you're going to have sex with me you can use a condom because I don't want to catch no diseases.' The defendant allowed her to get a condom [but then continued assaulting her.]"). As such, for all the foregoing reasons, we reject Appellant's contention that Victim consented to the entire incident.

*(Footnote Continued Next Page)*

a substantial and unjustifiable risk that Victim was not willing to engage in consensual sex, a gross deviation from the standard of conduct that a reasonable person would observe in Appellant's situation. As such, there was sufficient evidence that Appellant acted recklessly. ***See Weaver***. Based upon all of the foregoing, we conclude that the Commonwealth presented sufficient evidence that Victim did not consent and that Appellant acted recklessly to support all of Appellant's convictions. Accordingly, we discern no trial court abuse of discretion or error of law and Appellant's third issue on appeal lacks merit.

Finally, in his last appellate issue, Appellant claims that his convictions are against the weight of the evidence presented at trial. Appellant's Brief at 30-37. Appellant argues that the complainant's testimony, "much of it provably false, was so inconsistent" and "renders the entirety of the evidence to be tenuous, vague and uncertain" so as to shock the conscience of the court. ***Id.*** at 30. Appellant asserts that the complainant made conflicting statements about her sexual orientation and whether she was interested in Appellant romantically. ***Id.*** at 31-32. Appellant also alleges that the complainant offered "false testimony" and "grossly exaggerated the nature of vaginal bleeding" after the incident "to bolster her claim that the encounter

_____

Furthermore, at no time did Victim say she consented. Instead, as Appellant acknowledges, Victim consistently stated that Appellant may not have understood, or did not get the message, that he did not have consent. It was for the jury to decide whether Victim was not willing to engage in sexual intercourse and whether Appellant recklessly and consciously disregarded the risk.

- 23 -

was non-consensual." *Id.* at 33-34. Appellant posits, however, that "the vaginal bleeding was a result of her medical condition, pelvic floor dysfunction," that no witnesses saw blood on the complainant or her clothes immediately after the incident, complainant was not bleeding at the time of her medical exam, and that "during the [c]omplainant's exam no internal or external vaginal injuries were found" despite the complainant's claim that blood was "dripping down her legs" and that her clothes were "soaked" in blood immediately following the incident. *Id.* Appellant further notes that although the complainant testified that she could not physically walk after the incident, "surveillance video showed the [c]omplainant leaving [Appellant's] room after the encounter, walking normally." *Id.* at 35. Finally, Appellant argues that after the incident, the complainant made three false reports to the police alleging that Appellant was following and stalking her and had affixed tracking devices to her belongings. *Id.* at 35-36. In sum, Appellant suggests that the complainant's testimony was "internally inconsistent" and argues she "couldn't get any of her stories straight, [and, therefore,] it was impossible for the jury to do so." *Id.* at 37.

Our well-settled standard of review for a challenge to the weight of the evidence is as follows:

> [First, we recognize that a] challenge [to the weight of the evidence] concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. Moreover,
>
>> A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock

one's sense of justice. It is well established that a weight of the evidence claim is addressed to the discretion of the trial court, and a new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice.

In reviewing a challenge to the weight of the evidence, the function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. Appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose an abuse of discretion.

Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.

***Commonwealth v. Rodriguez***, 340 A.3d 334, 349 (Pa. Super. 2025) (internal citations and quotations omitted).

In this case, the trial court did not believe that the jury's verdict was so contrary to the evidence presented so as to shock its sense of justice. ***See*** Trial Court Opinion, 8/13/2024, at 13-15. As the trial court recounted, at trial the Commonwealth presented the testimony of Victim, her best friend, the SANE nurse at the emergency room, Cabrini University's public safety investigator, and the police detective assigned to the case; Appellant presented his own testimony and the testimony of three character witnesses. ***Id.*** at 14. The trial court ultimately concluded:

The jury had the sole discretion to assess the credibility of these witnesses. The jury was able to listen to these witnesses testify both during direct and cross-examination and observe their demeanor. The jury was able to consider all evidence presented when deliberating on the verdict including but not limited to: [a] video of Victim leaving [Appellant's] room, [a] transcript of [the] interview with Mary Anders[, Cabrini University's public safety investigator, a] transcript of [Victim's] interview with Detective Jagodzinski, text messages, [an] electronic medical report, notice of the allegations, [a] transcript of [Mary Ander's] interview with [Appellant], Mary Anders' report with highlights, [an] email from [Appellant] to Mary Anders, [an] incident report, supplemental incident [and] medical reports, [a] video interview of [Appellant], [] the search warrant, and [a] video of [Victim]. Based on evidence and testimony presented at trial, the jury found [Appellant] guilty. [As such, the trial court] denied [Appellant's] motion for a new trial based on the weight of the evidence.

*Id.* at 14-15 (superfluous capitalization and record citations omitted).

Based upon our standard of review and extensive review of the record, we discern no abuse of discretion by the trial court in denying Appellant's weight claim. As previously stated, credibility determinations and the resolution of conflicting evidence are exclusively determined by the jury. The jury decided the facts and were entitled to believe all, part, or none of the evidence. This Court cannot substitute its judgment for the jury's decision when supported by the record. On this record, as discussed at length above, we agree with the trial court that there was ample evidence to support Appellant's convictions and that the jury's verdict does not shock the conscience. Hence, Appellant is not entitled to relief regarding his claim challenging the weight of the evidence presented at trial.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>12/23/2025</u>